# EXHIBIT 2

**To the Memorandum of Law of Twentieth Century Fox Film Corporation in Support of Its Motion to Dismiss the Amended Complaint**

# GLICKMAN v. STERN

New York Supreme Court
New York County

MARK GLICKMAN v. HOWARD STERN, INFINITY BROADCASTING CORP., WWOR-TV INC., MCA INC., BOB WOODRUFF, and GARY DELL'ABATE, October 15, 1991

## REGULATION OF MEDIA CONTENT

1. **Defamation — Defamatory content — Humor and fiction — In general (§11.0505.01)**

Statements, made during television broadcast of videotaped skit featuring plaintiff's wife and during subsequent television and radio commentary discussing event, which could be considered unpleasant at best and gross or vulgar at worst but which, when taken in context, could not be understood to be anything more than purely nonsensical entertainment, are not defamatory.

2. **Privacy — Statutory right to privacy — State statutory protections — New York Civil Rights Law (§13.0502.02)**

Televised Halloween skit in which plaintiff's wife participated voluntarily cannot be said not to be "newsworthy" or of "public interest," despite plaintiff's claim that defendant talk show host is "not reputable or legitimate," since "newsworthiness" exemption to New York Civil Rights Law Sections 50 and 51 is not limited solely to "legitimate" news broadcasts, and thus use in skit of plaintiff's name and photograph, which were reasonably related to skit's subject matter, does not violate Sections 50 and 51, even if name was used in order to attract viewers.

3. **Defamation — Related causes of action — Intentional infliction of emotional distress (§11.5803)**

Plaintiff cannot maintain claim for intentional infliction of emotional distress claims that is grounded on same facts as his unsuccessful defamation claim.

---

Action against broadcast entertainer, alleging defamation, intentional infliction of emotional distress, and violations of New York Civil Rights Law Sections 50 and 51. On defendant's motion for summary judgment.

Granted.

*Full Text of Opinion*

Ciparick, J.:

James Thurber wrote, "Humor is a serious thing, I like to think of it as one of our greatest and earliest natural resources which must be preserved at all costs." "Humor's the true democracy" said R.V. Johnson. The issue in the instant motion is, when does humor at the expense of an identifiable private person become defamation. Humor has been used throughout the centuries by writers to depict and analyze human inadequacies.

Defendants, Howard Stern, Infinity Broadcasting Corp., WWOR-TV, Inc., MCA Inc., MCA Broadcasting, Inc., Bob Woodruff and Gary Dell'Abate, move for summary judgment, pursuant to CPLR 3212, dismissing the complaint and each and every cause of action alleged therein on the grounds that there is no triable issue of fact and defendants are entitled to judgment as a matter of law. A determination of this motion requires the striking of an appropriate balance "between the need for vigorous public discourse and the need to redress injury to citizens wrought by invidious or irresponsible speech" (Milkovich v. Lorain Journal Co., 497 U.S. ___, 110 S. Ct. 2695 [17 Med.L.Rptr. 2009]).

In the instant action plaintiff, Mark Glickman, asserts claims sounding in defamation, intentional tort and invasion of his right to privacy. These claims arise from a television broadcast of a videotaped skit with plaintiff's wife, Susan Glickman ("the Halloween skit"), which was made on Halloween night, October 31, 1990, and the subsequent television and radio commentary discussing the event.

The television show, which is broadcast regularly on Saturday nights, is hosted by Howard Stern, a talk show host well-known for his shocking and outrageous style, and co-hosted by Robin Quivers. Quivers also co-hosts Stern's radio show, *The Howard Stern Radio Show*, which is broadcast Monday through Friday on WXRK (92.3-FM). Both the television show and the radio show feature interviews, entertainment, items of human interest, and the exchange and expression of points of view to the public.

The Halloween skit came about when Stern, accompanied by members of his staff and television crew, went "trick or treating," in costume, in Bayside, Queens. Stern had hoped to capture people's reaction to adult men wearing Halloween masks. Susan and a friend (identified as "Dina") were driving by in Susan's automobile when they recognized Stern and said "hello," whereupon Stern and his staff walked up to her car. Thereafter, a discussion ensued and Stern learned Susan was married. Stern asked Susan if he could come back to her house for a "rubdown." Susan readily agreed.

At the Glickman residence, Susan changed into a negligee and she and her friend, Dina, wearing a kimono, gave Stern and other "trick or treaters" rubdowns. At all times, Stern (while wearing a Marge Simpson mask) was massaged by Susan, and the other members of his staff took turns getting massaged by Dina. Most of the camera attention was given to Stern and Susan.

During the taping someone handed Stern a framed wedding photograph of the Glickmans which was held up to the camera for a few seconds. Stern remarked "Mark's a lucky dude, swear to God; you're a good-looking girl; swear to God; poor Mark" (the "poor Mark" statement).

On that evening, Mark comes home from work and found a drawing, sketched by Stern. The drawing was a picture of Stern and contained the words "Dear Susan, I Love You. Howard Stern." Later that evening, Susan informed Mark of what transpired earlier that day. Susan assured Mark that, although she participated in the massage scene in order to be on the Howard Stern Television Show, she discussed with Stern and his crew favorable aspects concerning Mark and their marriage. Plaintiff alleges that Susan told Stern "in essence," that they were happily married and that Mark was well regarded by their family and friends, co-workers and in the community, however, none of this information was ever conveyed by Stern to his audiences on any broadcasts.

On the following day (November 1, 1990), Stern discussed the foregoing events on his radio show which airs from 6:00 a.m. to 10:00 a.m. Stern commenced his description of the rub-down incident by describing Susan and her friend, Dina, as "real nice, clean girls"—"Not hookers or anything like that, you know, housewives, but nice housewives before they had their kids and stuff." Stern also pointed out that he and his entire crew were wearing Halloween masks. "[A]nd we're in our masks still, and stuff, you know, you gotta realize how bizarre this whole thing is . . . I'm talking through a mask . . . Everybody's in a mask" (Id., p. 20). Stern also emphasized that he himself was married. "I figure I better get a massage from the girl who's married, cause if my wife sees me with a single girl its gonna be big trouble. So, I said, you know at least, like, she's married, you know what I mean, she's spoken for." He also noted that Susan and her friend had gone into the bathroom to change their clothes in privacy. "So the girls go into the bathroom, the adjoining bathroom, to get dressed . . . We're all standin' around waiting for rub-downs."

At this point in the radio program listeners called in and asked how far the events had gone. Stern made clear the true nature of the incident, *"don't forget, you know, it can only go so far 'cause there's a camera rollin' and I'm a married. . ."* [emphasis added].

Susan thereafter called up the radio station and joined the conversation. She then put her husband on the air. Mark went on the air, introducing himself as a "faithful listener" of the Stern show who "used to come home and talk about the show" to his wife. While on the air Mark joked about his intention to sue his wife, stating: "I'm gonna call my lawyer now. I'm gonna get a divorce." He also interjected that he thought it would be "funny" to have a camera crew tape his reaction while he himself watched the television broadcast. Stern specifically reassured him, "she didn't do anything, don't worry" and plaintiff assured Stern: "I'm cool." When Stern told plaintiff "we'd like to come back to your house" plaintiff immediately answered "definitely." Thereafter plaintiff voluntarily put his wife back on the telephone to continue the conversation with Stern. Stern said to Susan "as soon as I get in the car, "Ronnie goes, "How many times last night, did you have that girl?" Stern: "Just once." To which Ronnie replied according to Stern, "Yeah, me too" (the "Ronnie statement"). Robin: "So Ronnie had a rub-down too?" Susan: "No!" Stern: "Ronnie was angry. Ronnie didn't get the rub-down from the uh girl." Susan: "Howard, I don't even remember Ronnie in the bedroom." Stern: "Ronnie was the guy with the carpeting all over

his chest and back. The werewolf." Susan: "Ok, ok, ok." Stern: "That was the guy leering at you." Susan: "Oh. Ok." "The guy that saw your panties, your breasts, everything." Susan: "Uh huh." Susan signed off, "It was cool, Howard. I'll never forget this Halloween."

On November 3, the Howard Stern television show was broadcast on WWOR-TV. Stern, in the beginning of the televised broadcast stated that "we went trick-or-treating and all I'm gonna say is that this is the best eleven minutes of tape that you'll ever see ... wait till you see this — this is a married woman!" The Glickman skit was featured in the final segment of the television show and was entitled "trick or treat."

Robin Quivers commented, as she watched Susan's performance, "At first I thought, well this is interesting, she is saying. 'My husband bought this for me and I'm going to cheat on him, with all these guys in it'" (the defamation claim in the fifth cause of action). Robin Quivers also said, "I wonder what happened after the camera went off" to which Stern replied "it was innocent" (the "off camera statement").

On November 5, two days after the television broadcast, Stern called the Glickman residence. Susan indicated that her husband was upset about the television show and that he would not come to the telephone. Although Susan does not now contend that her rights were violated by defendants, nor could she (Susan signed an express written consent form for use of the Halloween skit), her husband commenced the instant action claiming the Halloween skit and references thereto injured *him* by causing people to think of him as "a loser" or "a wimp."

The complaint purports to allege five causes of action (i and ii) violation of Civil Rights Law §§50 and 51; (iii) intentional infliction of emotional distress; and (iv and v) defamation.

Plaintiff argues that his privacy was violated in that his name and likeness was used in an effort to increase ratings for an unnewsworthy purpose. In addition, he argues that, notwithstanding the conduct of his "starstruck" wife, that the statements cited in his complaint and additional statements cited in plaintiff's legal memorandum wrongfully portrayed him as having "an unhappy and unsuccessful marriage [and of] being a husband unable to satisfy his wife's sexual needs" or to use a more traditional phrase he claims he was portrayed as being a cuckold. As such, plaintiff contends that the statements are defamatory as a matter of law.

Defendants move for summary judgment dismissing all causes of action in the complaint on the ground that there is no triable issue of fact and are entitled to a judgment as a matter of law. They claim that the use of plaintiff's name and likeness was a protected use under the newsworthiness exception, and, in any event, too incidental and fleeting to be actionable. They claim that plaintiff's additional claims for alleged defamation and intentional tort, grounded on plaintiff's alleged embarrassment resulting from the skit, should also be dismissed as a matter of law because the commentary was obviously in jest, was a matter of opinion and when taken in context, no reasonable person could infer any of the defamatory or injurious meanings that plaintiffs strains to attach to them. Finally, they argue that the claims against defendants MCA Inc., Broadcasting, Inc. and Infinity Broadcasting Corp., should be dismissed on the additional ground that the corporations have been improperly named as defendants as they are only parent corporations of the corporations which controlled the television and radio broadcasts.

In opposition, regarding the defamation action, plaintiff argues that defendants' statements were mixed opinion or purely factual and thus are not constitutionally protected.

The award of summary judgment in defamation actions, as in civil actions generally, is appropriate where there are no material issues of fact (Rinaldi v. Holt Reinhart Winston, Inc., 42 N.Y. 2d 369 [2 Med.L.Rptr. 2169]. Indeed, motions for summary judgment are particularly useful devices in such actions as a means of obviating the necessity for protracted and expensive litigation, which may have a chilling effect on cherished constitutional freedoms such as free speech (Greenberg v. CBS Inc., 69 A.D. 2d 693 [5 Med.L.Rptr. 1470]). As in other civil actions, the defendant in a defamation action has the burden of establishing that the plaintiff's cause of action is without merit (60 Minute Man Ltd. v. Kossman, 161 A.D. 2d 574), or that defendant possesses a defense thereto which has been satisfactorily established to warrant the entry of judgment in his favor (CPLR 3212 [a]; Friends of Animals v.

Associated Fur Manufacturers, 46 N.Y. 2d 1065 [4 Med.L.Rptr. 2503]).

### Defamation (Fourth and Fifth Causes of Action)

The alleged defamation was broadcast on television and radio and is classified as libel (Matherson v. Marchello, 100 A.D. 2d 233, 239). While this court is not aware of any uniform definition of libel, the elements that are generally listed are as follows: (1) the writing (here broadcasting) of a statement by defendant; (2) that statement refers to plaintiff; (3) that the statement is of a defamatory nature; (4) that the statement is false; (5) publication of the statement to a third party; (6) malice; and (7) damages (43 N.Y. Jur. 2d Defamation and Privacy §1).

Here, as plaintiff has not pleaded specific damages he must establish that the purported defamatory material constituted libel per se, i.e., he must prove that the statements tended to expose him "to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right thinking persons, and to deprive him of their friendly intercourse in society" (Rinaldi v. Holt, Reinhart & Winston, 42 N.Y. 2d 369, 379 [2 Med.L.Rptr. 2169], quoting Sydney v. Macfadden Newspaper Pub. Corp., 242 N.Y. 208, 211-212.

Pursuant to CPLR 3016, "In an action for libel or slander, the particular words complained of shall be set forth in the complaint . . ." The instant complaint sets forth no "particular words complained of" except "Mark's a lucky dude, swear to God, you're a good-looking girl, swear to God; *poor Mark*," (fourth cause of action [emphasis added by plaintiff]): and a statement by Robin Quivers that "Well, this is interesting she's [Susan] saying my husband bought this for me and I'm going to cheat on him with all these guys in it," (fifth cause of action) to which Stern is claimed to have responded "Yeah." Plaintiff asks the court, however, to consider additional statements revealed in the transcripts which were made available to him subsequent to the drafting of his original complaint and which have been submitted to the court.[1]

Whether particular words are defamatory is a legal question for the court in the first instance to resolve (Tracy v. Newsday Inc., 5 N.Y.2d 134; Sprecher v. Dow Jones & Co., 88 A.D.2d 550 [8 Med.L.Rptr. 1681], aff'd 58 N.Y.2d 862 [9 Med.L.Rptr. 1223]). In analyzing the words in order to ascertain whether a question of fact exists "the court will not pick out and isolate particular phrases but will consider the publication as a whole. The publication will be tested by its effect upon the average reader and if not reasonably susceptible to a defamatory meaning they are not actionable and cannot be made so by a strained for artificial construction" (James v. Gannett & Co., 40 N.Y.2d 415, 419-421; Aronson v. Wiersma, 65 N.Y.2d 592, 593-594 [12 Med.L.Rptr. 1150]).

Should the statements be reasonably susceptible of a defamatory connotation, then it is for the jury to determine whether or not the defamatory sense was the construction which the average person would be likely to place on the challenged statements (Silsdorf v. Levine, 59 N.Y.2d 8 [9 Med.L.Rptr. 1815]; Frank v. National Broadcasting Co. Inc., 119 A.D.2d 252 [2d Dept. 1963] [13 Med.L.Rptr. 1801]). The converse is also true; the complaint in a defamation action cannot be dismissed unless the court determines that the contested language is incapable of a defamatory meaning as a matter of law (see, Matherson v. Marchello, 100 A.D.2d 233, 240; Aronson v. Wiersma, 65 N.Y.2d 592, 593 [12 Med.L.Rptr. 1150]). Therefore, if the instant action is to be dismissed, the court must first find, as a matter of law, that the Halloween skit and the radio and television commentary thereon was not susceptible of a defamatory meaning.

In determining whether the publication is defamatory, the court will not lift the remarks out of their context (James v. Gannett Co., 40 N.Y.2d 415); "in cases involving comedic expressions, courts must examine the challenged statement in light of its content, its effect on the audience, and the context of its delivery" (Friedlander v. Edens Broadcasting, Inc., 734 F.Supp. 221, 228 [17 Med.L.Rptr. 1659]). What is defamatory "depends among facts, upon the temper of the times, the comment of contemporary opinion with the result that words, harmless in one age and in one community, may be highly damaging to reputation at another time or in a different place" (Mencher v. Chesley, 297 N.Y. 94, 100).

---

[1] Plaintiff had previously sought and was granted leave to amend his complaint to include said additional statements, however he has not done so to date.

It is well-established that there should be "consideration of the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which might *'signal to readers or listeners* that what is being read or heard is likely to be opinion, *not fact'*" (Steinhilber v. Alphonse, 68 N.Y.2d 283, 292 [13 Med.L.Rptr. 1562] [emphasis added]). "The test is not whether the story is or is not characterized as 'fiction,' 'humor,' or anything else in the publication, but whether the charged portions in context could be reasonably understood as describing actual facts about the plaintiff or actual events in which she participated" (Pring v. Penthouse International Ltd., 695 F.2d 438 [8 Med.L.Rptr. 2409]).

Plaintiff attempts to argue under Steinhilber v. Alphonse, 68 N.Y.2d 283 [13 Med.L.Rptr. 1562], that the statements were actionable mixed opinion based upon the opinion vs. fact dichotomy. This is misplaced. The proper line of cases are those concerning humor, comedy and satire rather than fact vs. opinion.

Humor and comedy are not synonymous with opinion (Frank v. National Broadcasting Co. Inc., 119 A.D.2d 252, 257 [13 Med.L.Rptr. 1801]), and as such they are not subject to the blanket First Amendment protections granted opinions (see, e.g., Triggs v. Sun Print & Pub. Ass'n, 179 N.Y. 144, 155). In short, "a person shall not be allowed to murder another's reputation in jest" (Donoghue v. Hughes, 1831 Hayes Exch. 265, 266 [Ire.]; Frank v. National Broadcasting Co. Inc., 119 A.D.2d 252, 257 [13 Med.L.Rptr. 1801]).

It is equally true "as Judge Learned Hand once observed . . . all ridicule . . . or all disagreeable comment . . . is [not] actionable; a man must not be too thin-skinned or a selfimportant prig" (Frank v. National Broadcasting Co. Inc., 119 A.D.2d 252 [13 Med.L.Rptr. 1801], citing Burton v. Crovell Pub. Co., 82 F.2d 154, 155). Defamation actions have not been sustained where the purported statements are patently humorous, devoid of serious meaning or intent and impossible of being reasonably understood otherwise (Frank v. National Broadcasting Co. Inc., 119 A.D.2d 252 [13 Med.L.Rptr. 1801]; Pring v. Penthouse International, 695 F.2d 438 [8 Med.L.Rptr. 2409]).

The key is whether the statements were intended to injure as well as amuse and whether they give rise to an impression that they are true (Triggs v. Sun Print & Pub. Ass'n, 179 N.Y. 144).

Regarding the "poor Mark" statement, the comment "Mark's a lucky dude, swear to God; you're a good-looking girl, swear to God; poor Mark" (fourth cause of action) is clearly not a defamatory statement on its face. Stern's saying the remarks while holding up plaintiff's wedding picture does not change the fact that the words were obviously said in a humorous vein.

Regarding plaintiff's fifth cause of action, which statement is, "At first I thought, well this is interesting, she is saying, 'My husband bought this for me and I'm going to cheat on him, with all these guys in it'," Robin Quivers' statement is prefaced, "At first I thought, . . .," which denotes that the statement is an opinion of Quivers, not a statement of fact. Moreover, all of the facts upon which Quivers' opinion is based are disclosed in the videotape.

In the next example asserted by plaintiff, Robin Quivers' rhetorical question, "I wonder what happened after the camera went off" was actually answered by Howard Stern stating, "It was innocent." Quivers' comment was a question, not a fact statement, and the statement of fact which answered it precludes any conceivable defamatory implication.

Regarding the "Ronnie statement," where Stern says "Ronnie goes, 'how many times last night did you have that girl?'"

(Stern says) "just once," he goes "Yeah, me too," at that point in the conversation, Susan was on the phone with Stern and pointed out that she did not even remember Ronnie being in the room; it is questioned whether Ronnie ever received a rub-down, and if so, not from Dina, her friend. The entire exchange is in a jocular vein, is not accusatory, and Stern's repeated comments that "nothing happened" make it difficult for any reasonable viewer to construe the "Ronnie" comments as factual accusations of adultery.

We turn now to plaintiff's allegations of implied defamation or innuendo. The canons are well known that where the words are clear and plain, the court must not only determine whether they are libelous or nonlibelous, but whether the innuendo is necessary (Tracy v. Newsday, Inc., 5 N.Y. 2d 136). The admitted purpose of innuendo is to explain matter

that is insufficiently expressed. Its purpose is to point out the libelous meaning of words used. "In brief, the question which innuendo raises, is . . . whether the explanation given is a legitimate conclusion from the premise stated" (Pry v. Bennett, 5 Sanf. 54, 65; Tracy v. Newsday, Inc., 5 N.Y. 2d 134).

Not only are the aforementioned statements obviously not defamatory on their face but applying the above principles of law to the construction of the statement urged by plaintiff this court believes said interpretation is strained and unjustified. Reading the statements reasonably and taking the words in their natural import, the court finds that no defamatory meaning can be intended.

Plaintiff's reliance on Matherson v. Marchello, 100 A.D. 2d 233 [2d Dept. 1984] is also misplaced. In Matherson, the defendants involved in litigation with the plaintiff husband and stated in a radio broadcast that they had been "fooling around: with his wife and that someone else had been fooling around with his boyfriend — imputing homosexuality. Both the husband and the wife sued. Although the court noted the phrase "fooling around with his boyfriend" could be libel per se, unfortunately the decision is not clear on whether said remark would be libelous as against the plaintiff husband or plaintiff wife. The decision was based upon the pleadings (CPLR 3211), which did not permit consideration of any surrounding factual context and required that the remarks be deemed to have been stated seriously, as alleged. The issue of allegedly implied defamation in a humorous broadcast (which Katberson was not) and in the context of the lengthy discussion containing numerous statements expressly *refuting* any defamatory implications, as well as a taped reproduction of the actual event being discussed (as here), was not raised or addressed in Matherson.

In Frank v. National Broadcasting Co. Inc., 119 A.D. 2d 252 [13 Med.L.Rptr. 1801], upon which defendants rely in support of their motion (decided by the Second Department two years after it decided Matherson), defendant was a performer on Saturday Night Live who bore a noticeable resemblance to the plaintiff tax accountant by name and image. The performer nicknamed the accountant "Fast Frank" and depicted him as giving "ludicrously inappropriate" tax advice. While recognizing that reputation can be damaged by jokes and jest, the court pointed out "that language which can be construed only as 'rhetorical hyperbole' will not give rise to a claim for defamation." 119 A.D. 2d at 257, citing Greenbelt Publishers Assn. v. Bresler, 398 U.S. 6, 14 [1 Med.L.Rptr. 1589]. As the court recognized, "To hold otherwise would run afoul of the First Amendment and chill free speech rights of all comedy performers and humorists, to the genuine detriment of our society." 119 A.D. 2d at 260.

[1] Thus, the complained of statements here, although they might be considered by plaintiff to be unpleasant at best and gross or vulgar at worst, when taken in context, could not be understood to be reasonably considered by viewers and listeners of the Stern show as anything more than purely nonsensical entertainment. Neither were the statements themselves so malicious or vituperative that they would cause a person hearing them to hold the plaintiff in "public contempt, ridicule, aversion or disgrace" (see, Sydney v. Macfadden Newspaper Pub. Corp., 242 N.Y. 208 211–212, supra; Rinaldi v. Holt, Reinhart & Winston, 42 N.Y. 2d 369, 379, supra [2 Med.L.Rptr. 2169]; cf. Triggs v. Sun Print & Pub. Ass'n, 179 N.Y. 144, supra).

Summary judgment should not be withheld in such circumstances. The chilling effect of unfounded libel claims on free press and free speech is repugnant to the First Amendment (see, Karaduman v. Newsday, Inc., 51 N.Y. 2d 531 [6 Med.L.Rptr. 2345]; Anderson v. Liberty Lobby Inc., 477 U.S. 242, 256–257 [12 Med.L.Rptr. 2297]).

Thus, these statements presented as part of a larger and obviously comic entertainment program, coupled with the fact that they were neither malicious nor vicious personal attacks necessitates a finding that they were not defamatory as a matter of law.

Accordingly, that branch of the motion seeking summary judgment dismissing plaintiff's defamation claims (fourth and fifth causes of action) is granted and they are dismissed.

### Civil Rights Law

New York Civil Rights Law §§50 and 51 proscribe the use of a living persons's "name, portrait or picture for advertising purposes, or for purposes of trade without having obtained the written consent of such person" (Arrington v. New York

Times Co. 55 N.Y. 2d 433 [5 Med.L.Rptr. 2581]). The Civil Rights Law has created a limited right of privacy which had not existed prior to its enactment (see, Friehofer v. Hearst Corp., 65 N.Y. 2d 135).

The use of plaintiff's name, portrait or photograph is actionable only if such use is for commercial exploitation — i.e. for "advertising" or "trade purposes" (Lerman v. Flynt Distributing Co. Inc., 745 F.2d 123, 129 [10 Med.L.Rptr. 2497] ([2d Cir. 1984]).

To qualify as an "advertising purpose" the use of plaintiff's name or likeness must be part of an advertisement or solicitation for patronage of a particular product or service (Floreo v. Mosler Safe Co., 7 N.Y. 2d 276). It has been held that "advertising purposes" within the contemplation of the Civil Rights Law, requires "an exploitation of the name in the commercial announcement or in direct connection with the product itself" (Fleischer v. WPIX, Inc., 30 Misc. 2d 17).

However, the mere fact that a telecast is commercially sponsored does not make the use of a plaintiff's name or likeness a use for advertising purposes if there is no connection between the alleged use and the commercial (Gautier v. Pro-Football, 304 N.Y. 354 [1954]; Delan v. CBS Inc., 91 A.D. 2d 223 [9 Med.L.Rptr. 1130]). Nor is a use considered for advertising or trade purposes merely because the offending item is included in a publication solely or primarily to increase the circulation of the publication and therefore its profits. It is recognized that most publications are in business to make a profit and seek to increase their circulation (Freihofer v. Hearst Corp., 65 N.Y. 2d 135).

Thus, a publisher or news disseminator may publicize the quality and content of its work by exhibiting extracts, including plaintiff's photograph, as part of an express solicitation of subscriptions without violating the statute (Lerman v. Flynt Publishing Co., Inc., 745 F.2d 123, 130 [10 Med.L.Rptr. 2497]; Sidis v. F-R Pub. Corp., 113 F.2d 806 [1 Med.L.Rptr. 1775]; Velez v. V.V. Pub. Co., 135 A.D. 2d 47 [14 Med.L.Rptr. 2290], app. den. 72 N.Y. 2d 808 [15 Med.L.Rptr. 2263].

Thus, even if Glickman's name were used to attract viewers for the television segment, this form of commercialization — the use to increase patronage — is not actionable under the statute unless plaintiff demonstrates that the work in issue is not newsworthy or of public interest or that his name and picture have no reasonable relationship to the subject matter of the trick-or-treat skit (see, Finger v. Omni Publications International Ltd., 77 N.Y. 2d 138 [18 Med.L.Rptr. 1555]; Binns v. Vitagraph Co., 210 N.Y. 51 [1913]).

The New York Court of Appeals has applied the newsworthiness exemption liberally, Arrington v. New York Times Co., 55 N.Y. 2d 433 [5 Med.L.Rptr. 2581]; Finger v. Omni Publications International Ltd., 77 N.Y. 2d 138 [18 Med.L.Rptr. 1555]; Stephano v. News Group Publications, Inc., 64 N.Y. 2d 174, 184 [11 Med.L.Rptr. 1303], applying it to political events, social trends, advances in science, and developments in the fashion world.

Precisely in the context of a comedy performance the court rejected a plaintiff's Civil Rights Law §51 claim in Frank v. NBC, 119 A.D. 2d 252, 256 [13 Med.L.Rptr. 1801], where plaintiffs' name and likeness were used and it was assumed for the purpose of the motion that defendants intended to and did depict plaintiff.

Additionally, published reports of intimate details of the lives of individuals who have studiously avoided publicity have been held to be "newsworthy" within the purview of this exception. See, e.g., Sidis v. F-R Pub. Corp., 113 F. 2d 806 [1 Med.L.Rptr. 1775] (article dissecting the private life of a child prodigy who, in later life, sought to conceal his identity held not actionable);

Regrettably or not, the misfortunes and frailties of neighbors and 'public figures' are subjects of considerable interest and discussion to the rest of the population. And when such are the mores of the community, it would be unwise for a court to bar their expression in the newspapers, books, and magazines of the day. Sidis v. F. R. Pub. Corp., 113 F.2d 806, 809 [1 Med.L.Rptr. 1775].

Accordingly, it cannot successfully be argued that the newsworthiness exemption is limited to a "legitimate" news broadcast or that it does not apply to a comedy performance. The fact that plaintiff deems Stern to be "not . . . reputable or legitimate" or his statements "outrageous" are not relevant.

Moreover, the question of newsworthiness is a question of law, determinable by a court on a motion for summary

judgment (Freihofer v. Hearst Corp., 65 N.Y. 2d 135, 140–141).

In the instant matter the televised Halloween segment with Susan Glickman falls within the ambit of matters involving "the frailties of neighbors [which] are subjects of considerable interest and discussion to the rest of the population, "Sidis, supra. See also Goelet v. Confidential Inc., 5 A.D. 2d 226, 230 ("The increased circulation of magazines such as 'Confidential' is mute testimony that the public is interested in the kind of news that magazines purvey"). The fact that Glickman's wife invited Stern and a camera crew into her home for a rubdown while they were dressed in towels and Halloween masks and while she was dressed in a negligee, certainly presented a situation of interest to the public and which invited attention, comment and public discussion. Susan Glickman invited this public attention and consented to it.

Moreover, it is not for this or any court to pass value judgments predicated upon ephemeral subjective considerations which would serve to stifle free expression. 'What is one man's amusement, teaches another's doctrine'. Paulsen v. Personality Posters, 59 Misc. 2d 444 [citations omitted].

[2] It is well-settled that the courts will not endeavor to supplant the editorial judgment of the media in determining what is "newsworthy" or of "public interest" (see, Sidis v. F-R Pub. Corp., 113 F. 2d 806, 809 [1 Med.L.Rptr. 1775]).

The New York courts have consistently held intrusive uses to be exempt under the Civil Rights Law as long as some connection between the subject matter of the work and the questionable use, however tenuous, can be demonstrated. "[O]ther than in the *purely commercial* setting covered by sections 50 and 51, an inability to vindicate a personal predilection for greater privacy may be a part of the price every person must be prepared to pay for a society in which information and opinion flow freely" (Arrington v. N.Y. Times Co., 55 N.Y. 2d 433 [5 Med.L.Rptr. 2581] [emphasis added]).

In the instant case the subject matter of the trick or treat skit is the unusual conduct of plaintiff's wife. Susan Glickman volunteered to participate in the taping of a television program by inviting strange men into her home for a "rubdown" while her husband was at work. The reference to her husband's first name and brief display of their wedding photograph were reasonably related to the subject matter of this interview. This connection is sufficient to exempt the complained of use from the statute's application (see, Finger v. Omni Publications International Ltd., supra; Friedman v. Friedman, 414 F. Supp. 77).

Additionally, regarding plaintiff's claims as to the frequency of use, it is well-established that isolated references of a fleeting and incidental nature are not actionable under Civil Rights Law §§50 and 51 (University of Notre Dame Du Lac v. Twentieth Century Fox, 22 A.D. 2d 452, aff'd 15 N.Y. 2d 940; Man v. Warner Bros. Inc., 317 F. Supp. 50, 53; Delan v. CBS Inc., 91 A.D. 2d 255 [9 Med.L.Rptr. 1130]).

The fleeting glimpse of Glickman's wedding photograph was incidental and not actionable under the rule. Moreover, the duration and quality of the videotape totally obscured any clear view of his face rendering the image unrecognizable (see, Bronson v. Fawceit publications Inc., 124 F. Supp. 429.

In addition, it is a well-established exception to the statute that "an active participant in a public event cannot invoke the protection afforded by these sections when his name, picture or portrait is used in connection with a truthful recounting or portraying of an actual current event as is commonly done in a single issue of a regular newspaper" (Flores v. Mosler Safe Co., 7 N.Y. 2d 276; Binns v. Vitagraph Co., 210 N.Y. 51 [1913]). "Once a person has sought publicity he cannot at his whim withdraw the events of his life from public scrutiny" (Goelet v. Confidential Inc., 5 A.D. 2d 226, 228).

Here, it was plaintiff who identified himself to the listening audience on the radio. Glickman volunteered to disclose his place of employment, and the time, location and circumstances under which he met his wife for the first time. In effect, Glickman identified *himself* to the public. It was not the instant defendants who invaded his privacy by mentioning where, in fact, it was the plaintiff himself who chose to state his own name in a voluntary "on the air" telephone call.

Thus, the use of plaintiff's name and likeness — although used to increase patronage — was a protected use under the newsworthiness exception, and in any event, too incidental to be actionable.

Accordingly, that branch of the motion seeking summary judgment dismissing plaintiff's Civil Rights causes of action

(first and second causes of action) is granted and they are dismissed.

### Intentional Infliction of Emotional Distress

The third cause of action asserts a claim for intentional infliction of emotional distress grounded on the same facts as the defamation action. The four requisite elements of this tort are the following: "(1) defendant engaged in conduct which went "beyond all possible bounds of decency; (2) defendant intended to cause distress or knew that his conduct would result in emotional distress; (3) the victim, in fact, suffered *severe* emotional distress; and (4) defendant's conduct, in fact, caused the distress" (Richard L. v. Armon, 144 A.D. 2d 1. 3). "[T]here can be recovery for this tort only 'where severe mental pain or anguish is inflicted through a deliberate and malicious campaign of harassment or intimidation' " (Doe v. American Broadcasting Companies, 152 A.D. 2d 482, citing Nader v. General Motors Corp., 25 N.Y. 2d 560). Intentional infliction of emotional distress is actionable where the conduct is so extreme and outrageous that it transcends the bounds of decency (Freihofer v. Hearst Corp., 65 N.Y. 2d 135, 143), which conduct has not been shown here.

[3] Additionally, should "the conduct complained of fall within the ambit of other traditional tort liability an action for emotional distress will not lie" (Fischer v. Maloney, 43 N.Y. 2d 553). Since the conduct here falls within the scope of the libel causes of action recovery under a separate emotional distress claim cannot be had (Manno v. Bembroke, 120 A.D. 2d 818). If the words spoken are protected speech then the right under the First Amendment cannot be subverted by allowing an action for intentional infliction of emotional distress (see, Murphy v. American Home Products Corp., 58 N.Y. 2d 293, 303).

Accordingly, that branch of the motion seeking summary judgment dismissing the third cause of action for intentional infliction of emotional distress is granted.

To recapitulate, defendants' motion for summary judgment dismissing each of the causes of action asserted by plaintiff is granted and the complaint is dismissed.

Settle order.

---

## KIMURA v. SANTA CRUZ SUPERIOR COURT

### California Court of Appeal Sixth Appellate District

VICTOR KIMURA, et al., v. THE SUPERIOR COURT OF SANTA CRUZ COUNTY, Respondent; DON VANDENBERG, Real Party in Interest, No. H008154, May 30, 1991 [petition for writ of certiorari denied January 21, 1992 by the U.S. Supreme Court]

### REGULATION OF MEDIA CONTENT

**1. Defamation — Summary judgment — In general (§11.5501)**

California's revised Code of Civil Procedure Section 437 (f) authorizes summary adjudication of causes of action or affirmative defenses, but not of issues, and thus libel defendant cannot obtain summary adjudication as to whether portions of allegedly defamatory letter are constitutionally protected, or as to whether plaintiff is public official.

**2. Defamation — Privilege — Fair comment/opinion (§11.4502)**

State university official's letter accusing another official of reinforcing view that university was "racist" and of actions representing an "incredible level of bigotry" is not actionable as matter of law, since, under totality of circumstances, statements cannot be reasonably understood as alleging or implying defamatory facts, but rather are rhetorical expressions of anger, resentment, or political differences concerning issue of public concern.

---

Action filed in California Superior Court, Santa Cruz County, alleging defamation and intentional infliction of emotional distress. On defendants' petition for review of trial court's decision denying their motions for summary judgment or summary adjudication.

Remanded with direction to enter summary judgment for defendants.

Jack W. Londen, Judith M. Schelly, Grant L. Kim, and Jon S. Tigar, of Morrison & Foerster, San Francisco, Calif.; Margaret C. Crosby, and Edward M. Chen, A.C.L.U. Foundation of Northern California, San Francisco; James E. Holst, Christine Helwick, and